Good morning. My name is Frank Lipuma, and I represent defendant appellant John Tompkins. May it please the court. This morning, we hope to convince the court that what occurred in the court below was an illean error, that that error was structural in nature, and alternatively, if the court does not agree that it was structural, that it was not harmless error. And we start with the really unchallengeable fact that John Tompkins was barred from raising a complete defense under the guise of what Johnson determined was subjective intent. But here's my issue with that point. Mr. Tompkins testified in his own defense. And he goes on at great length about the design of the pipe bomb. He explains that it was designed not to explode, that he keeps the wire unattached, that he separates the gunpowder from the shrapnel, basically, that he examines them with a voltmeter. He goes on and on. So it seems to me, if the jury had listened to this and had thought, this is a design, I mean, this could have been, you know, paper stuffed in the thing, there was nothing dangerous about it, the jury would have acquitted. So the jury has the question, are these things designed, you know, intended to be, in that sense of the word intent, intended to be explosive devices? So what do you do with that? Well, Judge, Mr. Tompkins did, was able to put his toe in the pool and talk about design. It's like his whole leg. Well, Judge, I respectfully disagree. I had the opportunity to serve as his pro se. You were standby. Standby counsel, yes, Judge. And so at the jumping off point of the design testimony, and I quoted it in our brief, he was answering that there were other safeguards put in place to make sure that things were not designed to function as destructive devices. And the prosecution objected and the court sustained that objection. That was our jumping off point to talk about the different devices that he constructed. So we're looking at not only the intent, why he did this, but also the design of how he did this. And that's how the government started after presenting its pretty much its complete case, including its experts saying that this was a bomb or it was a combination of parts of a bomb. They clearly were saying that Tompkins could not get into the design element. And Judge Dow grasped grappling with this problem really at the last minute, agreed with the government. And what the judge said was, I could put design, but I can't put design to counter the possibility that this was a weapon because as a matter of law under Johnson, it's classified as a weapon. Well, I get that. And the judge is trying to apply Johnson. So Tompkins is told you can't just tell the jury that this whole thing was supposed to be a hoax. What I can't find anywhere in the record, though, is the kind of thing we see in other cases where the defendant says, no, it's not a bomb. It's a firecracker. It's not a bomb. It's a toy. There's nothing. And I think the judge was trying to say under Johnson, this is a bomb. Maybe it was a bomb that wasn't going to work. And maybe the jury would say it wasn't dangerous or somehow not designed to be a bomb. You're correct, Judge. Mr. Tompkins never averred that it was a firework or but he did say legitimate. Well, yeah, that that's my question. What legitimate social purpose was it? Well, Judge, I think that was never that there was no evidence of any legitimate social purpose. I think she's out the door because of that case because of Johnson. So I'm sorry, Judge. I said, what is the social, the legitimate social purpose of the device? I think there was no testimony on that. I think I agree with you, Judge. In large part, I think Mr. Tompkins's position in the district court was this under subsection one. This was not an explosive, an explosive bomb. What the government should do is elect. Is this one or is this three a combination of parts? OK, so I think that was the first thing that he said. His position, Judge, was that these various components all had a social function, which. What was it capable of being converted into other than a bomb? I'll put it a different way. It could not. If the circuitry was completely wired up. If the device was functional, there certainly could not have been another purpose for it. But what Mr. Tompkins's use of this object was, was a threat, was to strike fear in these victims. It certainly wasn't. And I think his testimony is very clear. And I think a couple of the government's experts even agreed that this thing was not functional as designed because it wasn't wired up. But wait a minute. There was contested evidence on that because that was certainly his position. It wasn't functional because it wasn't wired up. But the government's experts, if I'm remembering correctly, said there are at least two ways it could have been quite functional. One, it could have jostled in shipping so that the stripped wire at the very end of the thing did come in contact with, completed the circuit. Or perhaps if it had just been dropped, that kind of impact. So the jury could have thought the government was just crazy and that nothing was going to happen with this thing. Or they could have thought, yeah, you're right. It was only luck that caused it from exploding. Well, that was the government's argument in closing, Judge. And when I made that point about some conflict, the government had two witnesses with respect to the explosive device. And that was Mr. Voorhees and Mr. Wenzel. And Mr. Tompkins chose not to pursue an expert. Is that correct? He did not call an expert, Judge. And I can get into the reason why with respect to the second argument if I could. But under these particular circumstances, Judge, Voorhees testified that this device would not explode. It was not functional, as did McGuire, another government witness. Wenzel did testify that this, as the court characterized it, this could have exploded in another way, even though it wasn't wired up. So that point is valid. But the fact of the matter is, Judge, Mr. Tompkins was precluded from really getting into the basic design elements of what he put together here, while the government and its experts talked about intent and design. For instance, when Mr. Wenzel was allowed to introduce the schematics, he talked that this was how this circuitry was intended to work. Does intent there really mean subjective intent in that statute? I don't think so, Judge. And that's part of the problem here, Judge. Really, it's just another way of saying design, isn't it? Intended to function or whatever the language is. It sort of is, Judge. And I agree with you. I think part of the problem with Johnson here is it really didn't, in none of the cases that really look at this problem, have really defined what is intent and what is design. Intent is this very large umbrella which seems to encompass a lot of potential conduct that's very relevant for the jury to consider. This is what we were barred from getting into in this case. The subjective intent, if it was limited to only he had some issues on his mail route, a death of a co-worker, or him being upset with 3Com and insider trading, I personally think that that could have come in to explain the nature of the threat of using this object. That he was upset with Wall Street. I think that that potentially should have come in. It really wasn't his subjective intent. Why is that relevant? I mean, you could be upset with Wall Street or you could just be an antisocial person. But if you send a bomb through the mail to somebody, what difference does it make? Well, I understand your point, Judge, and I won't argue that. I can understand why Judge Dow didn't allow him to get into that as well. But the way this ruling was made, Judge, as a matter of law, in the way the government used it in its closing argument, they basically said Judge Dow found that this is a firearm, which he did, as a matter of law. And that translated to, I mean, Judge Dow found it was a weapon. That weapon translated to a firearm. That firearm translated to a destructive device. And what type of destructive device, we don't know because the government never committed. Is it a bomb or is it a combination of parts? If it's a combination of parts, that brings into play the design, which we are abridged from getting into. It also goes into various aspects of intent in this case. And as Apprendi recognized, one of the core elements in a criminal prosecution is a defendant's intent. But what intent? I mean, there's no question that he, and he doesn't contest, that he intended to construct this device, that he intended to put it in the mail, that he intended to send it to the victims. He carefully puts their home address as the return address. I'm worried about your Apprendi-Allain argument in that it seems to me you're saying that even if, in a certain situation, there's no evidence that can go to a jury, the judge is somehow precluded from making that kind of ruling. And I don't think Allain changes the judge's responsibilities for when there is enough to send to a jury and when there isn't. Well, Judge, I respectfully would suggest that what the court considered in Johnson was a straight 5861 case. Many years later, we have a 5861 case in which Johnson would seem to control, but we also have Apprendi and its progeny, which basically says the jury has to find the characteristics in this case. So... Even if there's no evidence on the other side? I mean, don't you have sort of basic principles of trial practice that suggest you don't give to the jury questions where there's nothing for them to decide? Well, I again respectfully suggest, Judge, that maybe Tompkins was allowed to dip his leg in the pool about design, but it certainly wasn't the full explanation that he intended to give to the jury, and that's proven in his testimony. Even when the government was cross-examining him, he wanted to get into that these were not disruptive devices, and there was an objection to where his answer was going. After that, Judge, if I can understand the court's reluctance, I mean, there's several steps that we have to get in here procedurally. This did compromise his defense because it came at the last minute. He was set on his defense. The government presented all of its evidence, and the next thing you know, a pro se defendant who has to be about to present his opening statement, about to testify, has to reconfigure his entire defense. You're talking about the x-ray evidence? Well, I'm talking about... Yes, Judge, I'm talking about the first part as well because that was a last-minute machination by the government. You can't talk about subjectivity. And then the x-ray as well was a last-minute thing. In the government's explanation, I mean, there's just so many remarkable things about the government's explanation for withholding the most critical exhibit. John Tompkins carefully put together his defense. He respectfully... But what's the interest that Mr. Tompkins... Mr. Tompkins, who designed this device, must have known whether the shot and the stuff was all through it or whether it was at one end or the other, and I don't see what the social interest is in allowing him to lie about that. So if he's structured his defense to misrepresent what he did... That's really taken out of context, Judge, because the government made that argument, and Judge Dow said, I don't agree. I don't think Mr. Tompkins said that the x-ray of the Chicago device was the way he made that particular object. Judge Dow completely agreed with us on that, but the impact to us was so prejudicial because then when the prosecutor gets up in rebuttal argument, he gets in front of the jury and says, this x-ray proves that John Tompkins lied to you. And that's totally not what John Tompkins had testified to, but they used it for that very purpose after withholding it from him. And then the explanation that, you know, we had this document, we knew about it two weeks before trial, but we didn't tell the defense. We had it in our possession in this building in the U.S. Attorney's Office six days before trial, but we were going to bring it on the first day of trial, and they didn't. But they don't mention this most critical point. The day after they received that x-ray, there was a final pretrial conference in the case where the government delivered its exhibits and exhibits list, and that was not among the things included. Plus, John Tompkins said, Judge, all the CPD reports aren't here. This is an incomplete disclosure by the government. The government said, we have given him everything. They affirmatively made that representation. And where do we find ourselves now? They withheld that until the witness was on the stand and they displayed the x-ray for the jury to see. Thank you, Your Honor. Okay, thank you. Mr. Zuer? May it please the Court. Paul Zuer for the United States. Maybe you should start there, Mr. Zuer. Why didn't the government at the final pretrial conference or as soon as possible turn the x-ray over? About the final pretrial conference, at this point, Your Honor, I don't have any information. I don't have an answer. The record doesn't say it would be my speculation at this point as to why we were planning on waiting until April 23rd, the start of trial, versus April 18th. What I can glean from the record and my two-and-a-half-year-old memory at this point is that we had obtained this exhibit the night of April 17th. I believe that's in the record. The pretrial conference was the next morning. We didn't know what we had with this x-ray, whether it was significant, what it was. And we were compiling additional exhibits altogether to give to Mr. Tompkins on April 23rd. This was all coming as sort of a fast-moving trial preparation. I can understand that, but honestly this isn't just any old exhibit, right? This is the interior of the pipe bomb. It is, but we did actually have several other exhibits that showed the interior of the pipe bombs that did get introduced that Mr. Tompkins actually testified about during the trial. And when were those turned over? They were turned over years ahead of time. These are the depictions after they've been exploded or...? That's right, Your Honor, after they had been rendered safe. And to be sure, the x-ray was the only exhibit that we had that showed the construction of the pipe bomb or the design of the pipe bomb before it had been rendered safe. But the post-rendered safe photographs do show very important information, and they were used heavily by all of the government's witnesses. Officer McGuire, who testified about having rendered the devices safe, or the Chicago device safe, Officer Voorhees, Special Officer Winslow, they all testified about these photographs. And indeed, Mr. Tompkins testified specifically about the photographs of the Chicago device after they had been rendered safe. But that's not what Rule 16 says. Rule 16 doesn't say you can submit some of the results of physical or other testing, but not the ones you don't feel like submitting. And this falls, I think, squarely within the terms of the rules. And that's correct, Your Honor. At the end of the day, the government does not dispute that Judge Dow made the correct decision with respect to the X-ray. He decided when the government tried to move the exhibit in not to allow the government to do so on the day that the testimony was coming in from Officer McGuire. It had already been displayed, though, at that point, hadn't it? Not to the jury, Your Honor. Wasn't it on a document camera or something like that? It was on a screen that Mr. Officer McGuire was able to see. There's some evidence in the record that maybe the jury was able to see it as they were walking out of the courtroom because it hadn't been taken off that display. But there was no testimony at the moment that the jury is coming out of the courtroom as to what they're seeing on the screen. And plus, Judge Dow was accurate when he said that it wasn't going to matter because the jury was going to be instructed that if the exhibit was not introduced into evidence, then the jury was going to be instructed that it couldn't consider it. It could only consider evidence that had been introduced to it in making deliberations. Plus, it wouldn't have had the X-ray in the jury room when it was deliberating on this case. So Judge Dow barred the admission of the exhibit at the time of the government trying to introduce the exhibit on April 25th, the second day of trial, or third day of trial. And it didn't come in in the government's case in chief. That is an absolutely appropriate remedy for the Rule 16 violation. But then he took the stand and it did come in. It did come in in a rebuttal case for the limited purpose of showing that the defendant was lying. And that's how the government argued it. The government didn't talk about the X-ray in its principal close, its opening close. It talked about the other exhibits in the case. But the government certainly, in the rebuttal case, explained what the X-ray showed. Absolutely, Your Honor. And what it meant, the significance of the X-ray. In context of the defendant's lying. In context of saying that the jury couldn't believe what the defendant had testified to on the stand about using lead shot as an insulator against explosive powder coming into contact with a firing mechanism, the firing mechanism inside of the pipe. Which incidentally was, on its face, a somewhat unbelievable statement to make by Mr. Tompkins. The photographs, which again had been produced to Mr. Tompkins well in advance of trial, showed the relative sizes of the grains of particles, the explosive powder compared to the lead balls. And the jury could reasonably conclude that the defendant had been lying even without the X-ray in light of the fact that, given the relative size of the two things, the grains of explosive powder through transit of these pipes could have been mixed in with the explosive balls, allowing them to come in contact with the igniter. Was there testimony about that? No specific testimony, Your Honor, but the photographs showed it. The exposed pipes show how the grains were of different sizes, how the lead shot was much larger. This was absolutely evidence that was in the record that the jury could consider in reaching its conclusion concerning the defendant's testimony that he had used the lead shot as insulation. I would like to spend some time talking about the subjective intent. And I'm curious why you waited until trial, until you were arrested, basically, to move to preclude testimony about subjective intent. That had to be an issue in the run-up to this trial. Actually, Your Honor, it wasn't. It was part of the ongoing preparation that we were doing for this trial. And you can see in the chronology of how we discussed Johnson and presented Johnson in front of the district court that it wasn't something that we held back intentionally. We had presented our proposed jury instructions, didn't include an instruction concerning a firearm or destructive device definition. Then, on the first Friday of trial, so in between the two weeks of trial, we presented supplemental instructions that did include definitions of firearm and destructive device, and there referenced Johnson. But in that case, we were thinking about Johnson and referencing Johnson in connection with the jury instruction. It wasn't until we sat down and considered Johnson even more and looked at Johnson and the holding of Johnson even more that we saw this issue and raised the issue. There were years of preparation for the trial, and the defendant obviously was resisting all along and was contending all along that this was not his subjective intent to use these as explosive device. Defense raised a whole variety of defenses through pretrial litigation. You're right. This was a very heavily litigated case, but it wasn't focused on whether or not the defendant's subjective intent was. Well, then why have a jury instruction on intent? The jury instruction specifically mentioned intent, and if you weren't proceeding under an intent theory, why was it offered? Again, Your Honor, that's, again, showing the chronology. We introduced the proposed instruction coming off of the statute and how the statute was phrased, the combination of parts instruction. And so that was a statute you didn't look at before with all these years of preparation? No, we had looked at it and we had considered it. And so to answer Judge Tinder's question, the whole issue of intent was an issue from the beginning. Not specifically the intent portion of that statute. No, that wasn't something that we had considered. And, again, this is beyond the scope of what's in the record. It's going off of my two-and-a-half-year-old memory and speculation. So does your memory have any recollection of why you needed to have the specific intent instruction you're just saying because that was part of the statute that was in there? I'm not sure what you mean by specific intent. I'm thinking about the combination of parts instruction. Well, if the government, if you weren't, you did proceed under an intent theory, right, that he had to intend the use of the device or intend to make the device or create the device. I've got to get the statute in front of me. Well, sure, but that's a different intent than what is talked about in the statute and subjective intent with respect to the definition of destructive device. I think we're talking about two different intents here. I thought the district court gave an instruction that basically tracked the statute where he is telling them what a firearm includes, any destructive device, and then he defines destructive device when the term destructive device is used in these instructions and any explosive bomb or any combination of parts either designed or intended for use in converting, etc., etc., etc. That's right. So that's just the statutory language, I think. That's the statute. That's right. So he tells the jury that.  then in light of everything else that happened in trial, hasn't he basically told the jury, you have to find that this is a destructive device? Has he really left that issue for the jury? No, I absolutely think the judge left that issue for the jury, Your Honor. The only thing that was kept out and kept away from the jury was what the government put in its brief, the defendant's ability to use the label prop or hoax. And we know that, Your Honor, not so much from what happened in front of the jury, but from the defendant's proffer at the end of trial. The defendant stood up in front of Judge Dowd and proffered exactly what he wanted to put in front of the jury had he been allowed to say everything that he wanted to say. It shows up at page 1791 of the trial transcript. And at that point, when he has the floor to say, this is it, Your Honor, this is what, this is my record, this is what I want to say, what I would have said had I had unfettered access to the jury and my testimony. What I wanted to say was that I meant these things. The purpose for me sending these things was for them to be props or hoaxes. That's the extent of his testimony on that point. So the judge also prevents him from or rejects an instruction that would say a destructive device does not include any device which is neither designed nor redesigned for use as a weapon? That's right. And I think that portion of the statute, the whole statute just needs sort of a statutory analysis, if you will. The two statutes, 921A4 and 5861D, they're identical. They break down into subparts, right? The first part that is relevant here is whether the device was or was not an explosive bomb, period. There's no place for intent in that part of the statute. The next part of the statute turns to combination of parts and whether the combination of parts was designed or intended to be readily assembled into one of the enumerated destructive devices. But your instructions or the court's instructions don't really dissect out those two things. It's not like the jury gets one instruction, is this an explosive bomb, and then a different instruction, is this a combination of parts. No, that's right. They were put together, and that was actually through an extended jury instruction conference where we talked about how we wanted to present that definition to the jury. It's an issue that we, frankly, in part left up to the defense. Is this okay with you, Mr. Tompkins, if we put the different parts together like this? Mr. Tompkins responded with advice from Mr. Lupuma, who was present. Yes, this makes sense. This is clear and easy for the jury to follow for both counts 11 and 12 on the one hand and count 13 on the other. But even more than that, Your Honor, getting back to the question about that omitted sentence, if I may finish. Yes, please finish your thought. The reason why I brought up the combination of parts point and the word intent there is that when you get to the affirmative defense, whether the device was designed or redesigned for use as a weapon, the word intent is, again, omitted. It's not part of that affirmative defense. So for the affirmative defense, the statute requires a review of the objective nature of the device in hand, either the device or the combination of parts for the device. It has nothing to do with the purpose for which the defendant had the device. And that statutory structure makes sense, Your Honor, and it bears out in this circumstance. Congress didn't want to allow individuals who had weapons to stand up and present evidence that the purpose for what looked to be a weapon was something what was a prop or a hoax or something to scare a person but not actually meant as a weapon. That's not the purpose of that affirmative defense. Okay. So for those reasons, the government asks the court to affirm the judgment of the district court. Thank you. Thank you very much. Anything further, Mr. Fulman? I will give you time. We've gone over a little bit, so you can give him two minutes. Thank you, Your Honor. Judge, let me just pick up real quickly with Mr. Zurs's point that John Tompkins okayed the jury instructions. The jury instruction conferences were challenged. We challenged them basically across the board on the destructive device question. And I'll specifically point the court to page 1405 and 1406 of the trial transcript where I'm speaking about the fact that Mr. Tompkins is going to seek, say, unanimity, which is something he requests it would be if the government is allowed to present one, meaning subsection one and subsection three. What did you find, jury? Is it an explosive bomb or is it a combination of parts between one and three? So we requested a special verdict finding and unanimity on it. With respect to the X-ray judges, what I just would like to say is some jurors could actually see the X-ray on the monitor from the witness stand. Judge Dow confirmed that on the record. All jurors could see it if they wanted to as they passed by the witness stand because it was still displayed on the monitor. The issue about it coming in during the government's rebuttal case, it really is a red herring because what the government argued was that Tompkins lied. Tompkins didn't lie. He didn't say the Chicago device, which is the X-ray, he didn't say the Chicago device was packed with shot on one side and powder on the other side. He didn't say that. The government said that. And so Judge Dow said, I'm going to let it in anyway. It was a ruling of convenience. It's up to the jury to decide what the probative value is in this instance. And finally, if I may just offer this, in this whole thing about John Tompkins' lie, the government sought an obstruction of justice enhancement based on his testimony at the sentencing hearing and Judge Dow refused to apply it. He said John Tompkins didn't lie. So the point they were making at trial about the lie, the purported lie, in the long run Judge Dow found it not to constitute an obstruction of justice. Thank you, Your Honors. All right. Thank you very much. And were you appointed at this stage, Mr. LaPluma? We appreciate your help very much. Thank you so much for taking the appointment. Thanks to the government as well. We'll take the case under advisement.